IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

DAVID RODRIGUEZ,
Plaintiff,

v. Civil No. 3:20cv282 (DJN)

CITY OF HOPEWELL SCHOOL BOARD, *et al.*,
Defendants.

**MEMORANDUM OPINION**

Plaintiff David Rodriguez ("Plaintiff") brings this action pursuant to the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12101, *et seq.*, against Defendants the City of Hopewell School Board (the "Board") and the City of Hopewell (the "City") (collectively, "Defendants"), alleging that the Board discriminated against him because of his disability and that the City retaliated against him by unlawfully disclosing his disabled status to the Board.

This matter now comes before the Court on Defendants' Motions to Dismiss (ECF Nos. 15, 17), which move pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Plaintiff's claims for failure to state a claim. For the reasons set forth below, the Court DENIES the Board's Motion to Dismiss (ECF No. 15), GRANTS the City's Motion to Dismiss (ECF No. 17) and DISMISSES WITHOUT PREJUDICE Counts Two and Three of Plaintiff's Amended Complaint (ECF No. 11).

## I. BACKGROUND

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept Plaintiff's well-pleaded factual allegations as true, though the Court need not accept Plaintiff's

legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). With this principle in mind, the Court accepts the following facts.

**A. Plaintiff's Employment with the City and Disability**

On January 8, 2007, the City hired Plaintiff as a police officer. (First Am. Compl. ("Am. Compl.") (ECF No. 11) ¶ 10.) On October 13, 2013, in the course of his duties, Plaintiff sustained back injuries from an automobile accident, the treatment for which precluded him from carrying a firearm. (Am. Compl. ¶¶ 11, 59, 61.) In response, the City temporarily transferred Plaintiff from active patrol to the position of "Training Officer," which did not require him to carry a firearm and carried no police powers. (Am. Compl. ¶ 12.) To obtain this accommodation, Plaintiff provided medical information to the City. (Am. Compl. ¶ 13.) Relevant here, Plaintiff also had a preexisting diagnosis of post-traumatic stress disorder ("PTSD") from his service in the United States Army. (Am. Compl. ¶ 22.)

While Plaintiff served as a training officer, his direct supervisor, Michael Whittington ("Whittington"), mocked Plaintiff's disabilities and used the nickname "PTSD" to refer to him. (Am. Compl. ¶ 65.) In January 2014, Plaintiff filed a complaint with the City, asserting that Whittington harassed him and created a hostile work environment. (Am. Compl. ¶ 67.) After an investigation, on January 24, 2014, the City issued a "'counsel and assistance'" notice to Whittington for "'unbecoming conduct.'" (Am. Compl. ¶ 69.)

Eventually, on July 6, 2015, Plaintiff's treating physician informed the City that Plaintiff would need long-term medicative care that would preclude him from ever carrying a firearm. (Am. Compl. ¶ 14.) Based on this information, the City notified Plaintiff that it could no longer accommodate him and that his employment with the City would end on December 1, 2015. (Am. Compl. ¶ 15.) Specifically, on September 10, 2015, the City's chief of police, John

Keohane ("Keohane"), sent Plaintiff a letter stating that carrying a firearm constituted "'a critical element to the position of a Police Officer'" and that, due to staffing shortages, the City could not permanently convert Plaintiff's police officer position into a civilian position. (Am. Compl. ¶¶ 16-18.) The letter stated that Plaintiff could maintain his employment only if he could qualify on the shooting range and receive a medical release to work full-time before his December 1 end date. (Am. Compl. ¶ 19.)

Unable to meet the requirements to maintain his position, Plaintiff retired from the City's police force on December 1, 2015, and his application for disability retirement was approved on August 18, 2016. (Am. Compl. ¶¶ 20, 71.) In total, Plaintiff served nine years on the police force and received positive performance evaluations and no disciplinary infractions during that time. (Am. Compl. ¶ 21.) Following Plaintiff's retirement, the City's deputy chief of police advised Plaintiff that the City most likely would hire him as a background investigator, as it had done with other medically retired officers, but the City never made such an offer. (Am. Compl. ¶¶ 73-75.) Neither did the City respond to Plaintiff when he applied for a part-time administrative assistant position in 2017. (Am. Compl. ¶¶ 76-80.) And the City also excluded Plaintiff from communications and social gatherings that the City organized for retired police officers, including Whittington's retirement party. (Am. Compl. ¶¶ 89-90, 95.)

**B. Alleged Discrimination by the Board**

After leaving his employment with the City, in July 2018, Plaintiff applied for a position as a security officer with the Board — a position that did not require Plaintiff to carry a firearm. (Am. Compl. ¶¶ 25, 31, 35, 81.) On August 20, 2018, the Board's director of personnel, Missy Shores ("Shores"), interviewed Plaintiff for the security officer position and, on August 29,

2018, Shores invited Plaintiff to a second interview with the president of the Board's security contractor, Michael Jones ("Jones"). (Am. Compl. ¶¶ 32-33.)

Before Plaintiff's second interview, Jones spoke with Keohane and told him that Plaintiff had applied for the security officer position. (Am. Compl. ¶¶ 34-35, 85.) Keohane revealed to Jones that Plaintiff had a disability and had retired from the City's police department as a result. (Am. Compl. ¶¶ 36, 86.) Based on this information, during his interview with Plaintiff, Jones asked Plaintiff about his disability. (Am. Compl. ¶ 39.) Plaintiff assured Jones that his disability would not affect his performance as a security officer. (Am. Compl. ¶ 40.) Jones then confirmed that he had spoken with Keohane, who had informed him about Plaintiff's disability. (Am. Compl. ¶ 41.)

On September 10, 2018, Plaintiff emailed Shores to ask about the status of his application, and Shores informed Plaintiff that a final decision had not been made. (Am. Compl. ¶ 42.) Plaintiff sent a second email on October 2, 2018, and, on October 3, 2018, Plaintiff received a form email stating that he had not been selected for the security officer position. (Am. Compl. ¶¶ 43-44.) After receiving the form email, Plaintiff sent a third email to Shores expressing concern over not being selected for the position. (Am. Compl. ¶ 45.) Plaintiff also requested copies of Jones's interview notes pursuant to Virginia's Freedom of Information Act. (Am. Compl. ¶ 46.) In response, Jones called Plaintiff to tell him that he had no recollection of Plaintiff's interview and that Plaintiff had not been selected because only six positions were available. (Am. Compl. ¶ 48.)

**C. Plaintiff's Amended Complaint**

On April 20, 2020, Plaintiff filed his initial Complaint (ECF No. 1) against Defendants and, after Defendants moved to dismiss, Plaintiff filed his Amended Complaint (ECF No. 11) on

May 26, 2020. In his Amended Complaint, Plaintiff raises three counts for relief based on the above allegations. In Count One, Plaintiff alleges that the Board willfully discriminated against him based on his disability in violation of the ADA by refusing to hire him for the security officer position after learning of his back injuries and PTSD. (Am. Compl. ¶¶ 29-56.) In Count Two, Plaintiff alleges that the City retaliated against him for complaining about unlawful harassment by "sabotaging" his application for the security officer position. (Am. Compl. ¶¶ 57-103.) And, in Count Three, Plaintiff alleges that the City unlawfully disclosed his medical information and disabled status to the Board. (Am. Compl. ¶¶ 104-10.)

From these counts, Plaintiff seeks a declaratory judgment that Defendants' actions violated the ADA; an injunction requiring the Board to hire him to a position of equal duties, responsibilities, pay and benefits to the position that Plaintiff would have held had the Board hired Plaintiff on September 1, 2018, or, alternatively, front pay and benefits; back pay; a sum to offset any tax consequences of receiving a lump sum award; consequential and incidental damages; fees and costs, including expert fees; and, any other relief that the Court deems appropriate. (Am. Compl. at 17-18.)

**D. The Board's Motion to Dismiss**

In response to Plaintiff's Amended Complaint, on June 9, 2020, the Board filed its Motion to Dismiss (ECF No. 15), moving to dismiss Plaintiff's discrimination claim against it for failure to state a claim. In support of its Motion, the Board argues that Plaintiff fails to allege facts to support the reasonable inference that the Board did not hire him based on his disability. (Def. Bd.'s Mem. in Supp. of Mot. to Dismiss ("Bd. Mem.") (ECF No. 16) at 5-7.)

Specifically, the Board contends that Plaintiff lodges only conclusory allegations of discrimination without facts to support those conclusions. (Bd. Mem. at 6.) The Board avers

that Plaintiff's allegations in fact support the inference that Jones did not base his hiring recommendations on Plaintiff's disability, because Jones asked Plaintiff about his disability and Plaintiff responded that his disability would not affect his job performance. (Bd. Mem. at 6.) Therefore, the Board maintains that Plaintiff fails to allege any bias against him. (Bd. Mem. at 6.)

Moreover, even though Plaintiff alleges that Jones knew of Plaintiff's disability before making his hiring recommendations, the Board contends that mere knowledge of a disability does not support the inference of discrimination based on that knowledge. (Bd. Mem. at 6.) And the Board contends that Plaintiff's discrimination claim must also fail, because Plaintiff fails to allege that the applicants that the Board ultimately hired lacked the same or better qualifications for the security officer position. (Bd. Mem. at 7.)

Plaintiff filed his Memorandum in Opposition to the Board's Motion on June 15, 2020, (Mem. in Opp. to Def. Bd.'s 2d Mot. to Dismiss ("Pl. Bd. Resp.") (ECF No. 19)), and the Board filed its Reply on June 22, 2020, (Bd.'s Reply Mem. in Supp. of Mot. to Dismiss (ECF No. 22)), rendering the Board's Motion now ripe for review.

**E. The City's Motion to Dismiss**

Separately from the Board, on June 9, 2020, the City filed its own Motion to Dismiss (ECF No. 17), moving to dismiss Plaintiff's retaliation and unlawful disclosure claims against it for failure to state a claim. As for Plaintiff's retaliation claim, the City argues that Plaintiff fails to adequately allege that his protected activity — complaining about the hostile work environment created by Whittington — constituted the but-for cause of the alleged retaliation by the City — Keohane's disclosure of Plaintiff's disabled status to Jones. (Br. in Supp. of the City's Mot. to Dismiss Pl.'s Am. Compl. ("City Mem.") (ECF No. 18) at 5-7.) Specifically, the

City contends that the lapse of time between Plaintiff's protected activity and the City's alleged retaliation — approximately four-and-a-half years — defeats the inference that Keohane disclosed Plaintiff's disabled status to Jones because of Plaintiff's protected activity. (City Mem. at 5-6.)

The City maintains that Plaintiff also fails to demonstrate any retaliatory animus by Keohane or other agents of the City, relying instead on a conclusory allegation that the City's police department disliked complaints by officers against their superiors. (City Mem. at 6.) The City notes that Plaintiff does not allege that the City treated him poorly between his hostile work environment complaint and his retirement eleven months later. (City Mem. at 6.) And although Plaintiff points to other forms of alleged animus following his retirement, including the City's failure to offer him a position as a background investigator or respond to his application for an administrative assistant position, the City argues that Plaintiff fails to demonstrate that these adverse actions stemmed from Plaintiff's 2014 complaint. (City Mem. at 6-7.) Likewise, the City avers that Plaintiff cannot rely on his disabled status to allege retaliation, because merely being disabled does not constitute a protected activity. (City Mem. at 7.)

As for Plaintiff's unlawful disclosure claim, the City contends that Plaintiff has not exhausted his administrative remedies by first charging the City with unlawful disclosure before the Equal Employment Opportunity Commission ("EEOC"). (City Mem. at 8.) Rather, Plaintiff's EEOC charge alleged only retaliation based on the unlawful disclosure, which constitutes a separate cause of action. (City Mem. at 8-12.) And even if Plaintiff has exhausted his administrative remedies, the City contends that Plaintiff's unlawful disclosure claim must still fail, because the ADA does not create a private right of action for violations of its

nondisclosure provisions and Plaintiff's allegations fail to establish an unlawful disclosure claim. (City Mem. at 12-15.)

Plaintiff filed his Memorandum in Opposition to the City's Motion to Dismiss on June 16, 2020, (Mem. in Opp. to City's Mot. to Dismiss ("Pl. City Resp.") (ECF No. 20)), and the City filed its Reply on June 22, 2020, (Reply Br. in Supp. of City's Mot. to Dismiss (ECF No. 21)), rendering the City's Motion now ripe for review.

## II. STANDARD OF REVIEW

A motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests surrounding the facts, determine the merits of a claim or address potential defenses. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests[.]'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id.* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable."

*Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other party's liability. *Id.* at 557. And the facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

## III. ANALYSIS

Because Defendants challenge all three of Plaintiff's claims, the Court will address each claim in turn.

### A. Plaintiff States an ADA Discrimination Claim Against the Board.

The Board argues that Plaintiff fails to state a plausible discrimination claim against it, because Plaintiff fails to allege facts to support the reasonable inference that the Board did not hire him based on his disability. (Bd. Mem. at 5-7.) Plaintiff responds that his allegations clearly support an inference of discrimination, because he has alleged that Jones in fact asked Plaintiff about his disability during the job interview, which alone constitutes an unlawful action and demonstrates that Jones considered Plaintiff's disability in making his hiring recommendations to the Board. (Pl. Bd. Resp. at 3.) Plaintiff further contends that Jones's claim that he could not recall the interview with Plaintiff establishes a consciousness of wrongdoing that supports an inference of discriminatory intent. (Pl. Bd. Resp. at 5.) And Plaintiff maintains that he need not allege the shortcomings of the other applicants to sustain his discrimination claim when the allegations show that discriminatory bias infected the City's decision-making process. (Pl. Bd. Resp. at 6-9.) The Court agrees with Plaintiff.

In reviewing discrimination claims under the ADA, courts rely on the *McDonnell Douglas* burden-shifting framework used in other employment discrimination contexts. *Laber v.*

*Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). As adapted for failure-to-hire cases, that framework requires plaintiffs to first establish a *prima facie* case of discrimination by showing that: (1) the plaintiff qualifies as disabled under the ADA; (2) the plaintiff applied for a vacant position with the defendant(s) for which he was qualified; and, (3) the defendant(s) rejected his application under circumstances giving rise to an inference of discrimination. *Wilson v. Dollar Gen. Corp.*, 122 F. Supp. 3d 460, 464 (W.D. Va. 2015) (citations omitted). Although at the motion-to-dismiss stage a plaintiff need not establish a *prima facie* case, the plaintiff's allegations must nonetheless "'raise [the plaintiff's] right to relief [under the *prima facie* framework] above the speculative level.'" *Coleman v. Md. Ct. of App.*, 626 F.3d 187, 190 (4th Cir. 2010) (alterations added) (quoting *Twombly*, 550 U.S. at 555).

Here, the Board does not challenge Plaintiff's allegations regarding his disabled status under the ADA or whether Plaintiff applied for a vacant position for which he was qualified — the first and second prongs of the *prima facie* case — so the Court will cabin its analysis to the third prong. To that end, a plaintiff raising a failure-to-hire claim must allege facts from which the Court can "infer impermissible animus." *Aletum v. Kuehne + Nagel Co.*, 2020 WL 1955553, at *10 (D. Md. Apr. 23, 2020). Importantly, "whether an employer can point to a legitimate, non-discriminatory reason to justify an adverse employment action arises in the 'burden-shifting' framework at the summary judgment stage" and will not support dismissal when a plaintiff has otherwise alleged facts supporting an inference of discrimination. *Harrison v. Capital One Servs., LLC*, 2020 WL 1955472 (E.D. Va. Apr. 23, 2020) (citations omitted).

Based on these principles, the Court finds that Plaintiff has alleged sufficient facts to support the plausible inference that the Board refused to hire Plaintiff based on his disability.

For one, Plaintiff alleges that Shores, the Board's agent, relied on Jones's recommendations to make her final hiring decisions, imputing Jones's potential animus to the Board. (Am. Compl. ¶ 47.) Plaintiff also alleges that Jones spoke with Keohane before Plaintiff's interview and learned about Plaintiff's disability. (Am. Compl. ¶¶ 34-36.) Indeed, Jones confirmed to Plaintiff that Keohane had informed him about Plaintiff's medical conditions and disabled status. (Am. Compl. ¶ 41.) Crucially, Jones asked Plaintiff directly about his disability and how it might affect Plaintiff's job performance, which supports the inference that Jones considered Plaintiff's disability as a potential disqualifier. (Am. Compl. ¶ 39.) And Jones's inability to recall Plaintiff's interview after Plaintiff asked for Jones's interview notes, while also recalling a non-discriminatory — albeit vague — reason why he did not recommend Plaintiff for hire, permits the inference that Jones wished to conceal or explain away his impermissible animus. (Am. Compl. ¶¶ 45-48.) Together, these allegations support the plausible inference that Jones did not simply decline to recommend Plaintiff with an awareness of Plaintiff's disability, but did so because of that disability, which the ADA prohibits. 42 U.S.C. § 12112(a).

Neither does the Board's reliance on *McCleary-Evans v. Maryland Department of Transportation* alter the Court's analysis. There, the Fourth Circuit affirmed the dismissal of the plaintiff's failure-to-hire claim under Title VII, because the plaintiff relied on conclusory allegations that her White interviewers had "predetermined to select for both positions a White male or female candidate," without other allegations to support her conclusion. 780 F.3d 582, 586 (4th Cir. 2015). The Fourth Circuit also stressed that the plaintiff needed to allege facts regarding the hired applicants' lack of qualifications; however, the Fourth Circuit did so only because such allegations would have provided an alternative "to the obvious . . . explanation that the decisionmakers simply judged those hired to be more qualified and better suited for the

[vacant] positions." *Id.* at 588. Unlike *McCleary-Evans*, Plaintiff has provided a plausible alternative to the "obvious . . . explanation" for the Board's refusal to hire him by alleging that Jones knew about Plaintiff's disability and considered it in his hiring recommendations.

Accordingly, the Court denies the Board's Motion to Dismiss as to Plaintiff's discrimination claim in Count One.

**B. Plaintiff Fails to State a Retaliation Claim Against the City.**

As mentioned, the City argues that Plaintiff fails to state a retaliation claim under the ADA, because Plaintiff fails to allege that his protected activity constituted the but-for cause of Keohane's decision to disclose Plaintiff's disabled status to Jones. (City Mem. at 5-7.) Plaintiff responds that a long lapse of time between a protected activity and a defendant's alleged retaliation does not carry the same negative inference of causation outside of wrongful termination cases. (Pl. City Resp. at 5.) Instead, Plaintiff avers that temporal proximity constitutes only one element in the causation analysis and that his allegations of recurring retaliation by the City prove sufficient to establish causation at this stage. (Pl. City Resp. at 6-7.) And because Keohane's disclosure of Plaintiff's disability status itself constituted an unlawful act, Plaintiff suggests that Keohane clearly possessed retaliatory animus. (Pl. City Resp. at 8.)

42 U.S.C. § 12203(a) provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." "In order to prevail on a claim of retaliation, a plaintiff must either offer sufficient direct and indirect evidence of retaliation, or proceed under a burden-shifting method." *Rhoads v. FDIC*, 257 F.3d 373, 391 (4th Cir. 2001). Under either method, the plaintiff need not show that he qualifies as disabled under the ADA. *Id.* Instead, "[w]hether a plaintiff proceeds by direct evidence or *McDonnell Douglas* burden-shifting, [he] must show (i) that [he] engaged in protected activity

and (ii) because of this, (iii) [his] employer took an adverse employment action against [him]." *Jacobs v. N.C. Admin. Office of the Cts.*, 780 F.3d 562, 577 (4th Cir. 2015) (citations omitted).

Here, neither party disputes that Plaintiff's January 2014 hostile work environment complaint constitutes the only protected activity that can sustain Plaintiff's retaliation claim. After all, Plaintiff alleges no other invocations of his rights under the ADA that could be interpreted as protected activity.[1] *See Peeples v. Coastal Office Prods., Inc.*, 203 F. Supp. 2d 432, 466 (D. Md. 2002) (holding that for an activity to be protected, there must be an invocation of one's rights under the ADA). Likewise, neither party disputes that Keohane's disclosure of Plaintiff's disabled status to Jones constitutes an adverse employment action. Indeed, the Supreme Court has expressly held that former employees may bring retaliation claims for the post-employment actions of a former employer. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997) (defining "employee" under Title VII to include former employees and permitting retaliation claims based on post-employment conduct). Therefore, the only remaining question becomes whether Keohane's disclosure of Plaintiff's disabled status was "because of" Plaintiff's January 2014 complaint.

To that end, ADA retaliation claims require a showing that the protected activity constituted the "but-for" cause of the adverse action. *Brady v. Bd. of Educ. of Prince George's Cnty.*, 222 F. Supp. 3d 459, 474 (D. Md. 2016) (citing *Gentry v. E. W. Partners Club Mgmt. Co.*, 816 F.3d 228, 235-36 (4th Cir. 2016)). That is, a plaintiff must prove that "the unlawful retaliation would not have occurred in the absence of the alleged [retaliatory animus] of the

[1] Although Plaintiff alleges that he received an accommodation for his disability, he does not allege that he instigated the request for the accommodation or that the City retaliated against him based on any request for an accommodation. Therefore, the Court does not interpret any request by Plaintiff for an accommodation as a protected activity for purposes of Plaintiff's retaliation claim.

employer." *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Ordinarily, temporal proximity between the protected activity and the adverse employment action provides strong support for causation; however, "[i]n cases where temporal proximity . . . is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (internal quotations and citations omitted). "Specifically, evidence of recurring retaliatory animus [and conduct] during the intervening period can be sufficient to satisfy the element of causation." *Id.* (citations omitted).

As for the causation prong of his retaliation claim, Plaintiff alleges, and the Court accepts as true, that within a month of Plaintiff filing his hostile work environment complaint against Whittington, on January 24, 2014, the City reprimanded Whittington with a "counsel and assistance" notice for "unbecoming conduct." (Am. Compl. ¶ 69.) Plaintiff continued to work as a civilian employee with the City for almost two years thereafter, until his retirement on December 1, 2015. (Am. Compl. ¶ 70.) Although following Plaintiff's retirement the deputy chief of police told Plaintiff that the City likely would rehire him as a background investigator, Plaintiff never received an offer for that position. (Am. Compl. ¶¶ 73-75.) And in 2017, Plaintiff applied for a part-time administrative assistant position with the City but again heard nothing. (Am. Compl. ¶¶ 76-79.) The City also excluded Plaintiff from social gatherings and communications for retired officers, including Whittington's retirement party. (Am. Compl. ¶¶ 89-95.) Finally, in August 2018, Keohane disclosed Plaintiff's disabled status to Jones. (Am. Compl. ¶¶ 84-86.)

The Court finds these allegations insufficient to support the inference that Plaintiff's January 2014 complaint constituted the but-for cause of Keohane's decision to disclose Plaintiff's disabled status to Jones. For one, the timespan between Plaintiff's protected activity

and the alleged adverse conduct — over four-and-a-half years — indicates a lack of causation, and Plaintiff fails to allege a recurring pattern of retaliatory conduct to bridge the temporal divide. Indeed, Plaintiff's allegations provide no examples of retaliatory conduct by the City or Keohane between Plaintiff's January 2014 complaint and his retirement nearly two years later in December 2015, during which period Plaintiff remained under the City's and Keohane's direct control and therefore the most vulnerable to retaliation. In fact, Plaintiff alleges that the City took disciplinary action against Whittington within a month of Plaintiff complaining about Whittington's conduct. (Am. Compl. ¶¶ 67-69.) And Plaintiff's application for disability retirement was approved in August 2016 without any alleged obstruction by the City. (Am. Compl. ¶ 71.)

Moreover, although Plaintiff alleges retaliatory conduct by the City following his retirement, such conduct provides only speculative evidence of retaliatory animus. For example, Plaintiff alleges that the City's deputy chief of police told Plaintiff when he retired that the City "would likely rehire him 30 days later as a background investigator" but never made such an offer; yet, Plaintiff fails to allege that he ever applied for or even followed-up with the City or the deputy chief of police regarding that position. (Am. Compl. ¶¶ 73-75.) Without any assurance by the City that it would unilaterally hire Plaintiff as a background investigator, the Court can only speculate that the City did not offer Plaintiff the position out of retaliation, and not simply because Plaintiff never affirmatively sought out the position.

Likewise, Plaintiff's allegation that the City never responded to his 2017 application for a part-time administrative assistant position describes little more than a standard grievance of job applicants nationwide, many of whom apply for job openings without ever receiving a response from a prospective employer. (Am. Compl. ¶¶ 76-80.) As such, Plaintiff has not shown that the

City treated him differently from other applicants or that it failed to deliver on any assurances that it would hire him or otherwise give his application preferential treatment.

As for the City's alleged exclusion of Plaintiff from social gatherings and communications for retired officers, considering that the City did not retaliate against Plaintiff for the nearly two years between his hostile work environment complaint and his December 2015 retirement, Plaintiff's alleged exclusion from social gatherings following his retirement proves insufficient to plausibly establish that the City retaliated against him "because of" his protected activity. Indeed, Plaintiff's allegations fall far short of the recurring animus that the Fourth Circuit found established causation in *Lettieri*, where the plaintiff alleged that within a month of her protected activity her supervisor stripped her of her job responsibilities, reduced her supervisory authority and started discussing how to terminate her employment. 478 F.3d at 650-51. Put differently, that the City would wait for over two years after Plaintiff's protected activity before first retaliating against him for that activity renders any assertion that the City retaliated "because of" Plaintiff's protected activity merely speculative.

Neither does the fact that Keohane's disclosure constituted an unlawful act itself establish retaliatory animus.[2] Plaintiff fails to cite to, and the Court has not found, any authority for the proposition that the unlawfulness of an alleged retaliatory act, alone, demonstrates the impermissible motivations behind the unlawful act. Indeed, as mentioned, the ADA prohibits retaliation "because of" a protected activity, which speaks to the motive behind the retaliatory act, not the wrongfulness of the act itself. *Jacobs*, 780 F.3d at 577.

---

2 As explained below, Plaintiff has not plausibly alleged that Keohane in fact violated the law when he disclosed Plaintiff's disabled status. Nonetheless, the Court accepts Keohane's disclosure as unlawful in resolving Plaintiff's argument on this point.

For these reasons, Plaintiff fails to state a retaliation claim against the City, and the Court will grant the City's Motion to Dismiss (ECF No. 17) as to Count Two of Plaintiff's Amended Complaint.

**C. Plaintiff Fails to State an Unlawful Disclosure Claim Against the City.**

The City challenges Plaintiff's unlawful disclosure claim on three fronts. First, the City contends that Plaintiff failed to exhaust his administrative remedies as to the unlawful disclosure claim. (City Mem. at 8-12.) Second, the City argues that the ADA's unlawful disclosure provision does not create a private right of action. (City Mem. at 12-14.) And, third, the City avers that Plaintiff fails to state a claim for unlawful disclosure of his disabled status, because Plaintiff fails to allege that the ADA's nondisclosure provision protected the information that Keohane disclosed. (City Mem. at 14-15.)

Plaintiff responds that he has properly exhausted his remedies before the EEOC, because the contents of his EEOC charge contained allegations regarding the unlawful disclosure of his disabled status. (Pl. City Resp. at 8-12.) Plaintiff also contends that the ADA provides a private right of action for unlawful disclosure, because courts, including the Fourth Circuit, have recognized such a right. (Pl. City Resp. at 12-14.) And Plaintiff argues that he has stated a claim for unlawful disclosure, because he disclosed his disabled status to the City as part of his request for a reasonable accommodation, which falls within the scope of the ADA's nondisclosure provision. (Pl. City Resp. at 14-15.)

Although ordinarily the Court should first determine whether Plaintiff may bring a private cause of action under the ADA's nondisclosure provision and, if so, whether Plaintiff properly exhausted his administrative remedies as to that action, the Court will forego both analyses here, because Plaintiff fails to cite to a provision of the ADA that the City plausibly

violated. Specifically, in arguing that he has stated an unlawful disclosure claim, Plaintiff cites to 42 U.S.C. § 12112(d)(4)(C), which provides that any medical information obtained from "voluntary medical examinations . . . which are part of an employee health program available to employees at that work site" or that an employer obtains from inquiries "into the ability of an employee to perform job-related functions" shall be treated as a confidential medical record, with limits on the employer's ability to disclose that information.[3] (Pl. City Resp. at 12-13.) However, Plaintiff fails to allege that § 12112(d)(4)(C) protected the medical information that Keohane disclosed.

Indeed, Plaintiff alleges that he voluntarily disclosed his impairments to the City through his personal physician. (Am. Compl. ¶¶ 13-14.) Importantly, Plaintiff does not allege that this disclosure occurred as part of an "employee health program" or in response to City-initiated inquiries regarding Plaintiff's ability to perform job-related functions. Instead, Plaintiff alleges that he received medical treatment from his personal physician and voluntarily disclosed that treatment and its consequences to the City to obtain an accommodation, the information from which does not fall under the protection of § 12112(d)(4). (Am. Compl. ¶¶ 11-13); *see Wiggins v. DaVita Tidewater, LLC*, 451 F. Supp. 2d 789, 801-02 (E.D. Va. 2006) (holding that § 12112(d) did not protect the plaintiff's bipolar disorder diagnosis from disclosure, because the plaintiff "received treatment from a private physician on her own initiative and voluntarily

---

[3] In his Response to the City's Motion, Plaintiff suggests that other provisions under § 12112(d) might also provide him with a right of action; however, the Court's review of that subsection provides no other possible avenues to relief. Indeed, Plaintiff's claim in Count Three would not fall under §§ 12112(d)(2) or (d)(3), because both provisions relate to information obtained from preemployment and entrance examinations, and Plaintiff does not allege that he disclosed his disabled status to the City through either means. Therefore, Plaintiff must rely on § 12112(d)(4), which relates to examinations and inquiries during an employee's employment.

authorized [her physicians] to disclose her diagnosis to DaVita"). Thus, on the facts alleged, Plaintiff has not stated an unlawful disclosure claim.

Because Plaintiff has not plausibly alleged that Keohane disclosed protected information, the Court grants the City's Motion to Dismiss (ECF No. 17) as to Count Three of Plaintiff's Amended Complaint.

## IV. CONCLUSION

For the reasons set forth above, the Court DENIES the Board's Motion to Dismiss (ECF No. 15), GRANTS the City's Motion to Dismiss (ECF No. 17) and DISMISSES WITHOUT PREJUDICE Counts Two and Three of Plaintiff's Amended Complaint (ECF No. 11). An appropriate Order will issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

/s/
David J. Novak
United States District Judge

Richmond, Virginia
Date: July 27, 2020